417 So.2d 1304 (1982)
Henry TAUZIN, d/b/a Mo's Buster Brown Shoes, et al.
v.
R. G. CLAITOR, et al.
No. 14994.
Court of Appeal of Louisiana, First Circuit.
June 29, 1982.
Rehearing Denied August 24, 1982.
*1305 Lewis O. Unglesby and Keith D. Jones, Baton Rouge, for plaintiffs-appellees Henry Tauzin d/b/a Buster Brown Shoes, Fred H. Russ, Jr. and Lois K. Russ d/b/a Sew & Sew Fabrics, Anthony A. Bordelon d/b/a Bordelon Sewing Center and Tri-J Enterprises, Inc.
Cordell H. Haymon, Baton Rouge, and Mack E. Barham, New Orleans, for defendants-appellants Robert C. Claitor and R. G. Claitor Realty Co.
Joseph E. Juban, Baton Rouge, for third party defendants-appellees Juban Properties, Inc., and Ray A. Juban.
Before LEAR, CARTER and LANIER, JJ.
*1306 LANIER, Judge.
This is a suit for damages in contract and tort by the tenants of a small shopping center in Baton Rouge, Louisiana, Henry Tauzin d/b/a Mo's Buster Brown Shoes, Anthony A. Bordelon d/b/a Bordelon Sewing Center, and Tri-J Enterprises, Inc. (hereinafter referred to as Tri-J), against their lessors, R. G. Claitor and R. G. Claitor Realty Company, a partnership in commendam (hereinafter referred to as Claitor and Claitor Realty). Claitor and Claitor Realty filed a reconventional demand against their tenants for unpaid rents. After a trial by jury on June 8-12, 1981, there was judgment on the main demand in favor of Tauzin for $40,000.00, Bordelon for $20,000.00 and Tri-J for $55,000.00. There was judgment by the trial judge in favor of Claitor and Claitor Realty on the reconventional demand for unpaid rents against Tauzin for $27,432.00 (36 months at $762.00), against Bordelon for $4,752.00 (9 months at $528.00), and against Tri-J for $2,989.00 (6.7 months at $447.50). Claitor and Claitor Realty took this suspensive and devolutive appeal.[1]

I. FACTS
In 1970, Claitor, the Kroger Company (hereinafter referred to as Kroger), and Ray Juban[2] (hereinafter referred to as Juban), owned three adjacent parcels of property denominated Parcels 1, 2 and 3, respectively, and executed a written Reciprocal Agreement for developing these properties jointly into a shopping center on Perkins Road in Baton Rouge, Louisiana. This Reciprocal Agreement provided in part that each owner granted to the other the right of access to and use of the common areas of the properties for use by pedestrians and vehicular traffic and for the parking of automobiles by the customers, employees and tenants in the shopping center. It also called for Juban to build a fifteen foot driveway along the eastern edge of Parcel 3.
By two separate acts of sale in 1971 and 1974, Claitor acquired Lot 8 which is adjacent to and east of Parcel 3. Claitor constructed two buildings on Lot 8 and the building closest to Perkins Road contained several stores which faced the parking lot on Parcel 3. Claitor furnished his proposed plans for the development of this property to Juban Properties, Inc. and its tenant on Parcel 3, T G & Y Stores Company. At that time counsel for Juban, apparently on behalf of Juban Properties, Inc., indicated in writing that he did "not object to such use of the fifteen (15) foot driveway by Mr. Claitor provided such use is acceptable..." to the T G & Y Company. T G & Y replied that it did not consider construction of the building and parking facilities by Claitor on Lot 8 as a violation of their lease agreement for the store.
Effective August 1, 1974, Tri-J Enterprises, Inc. leased 1504 square feet of building space from Claitor on the Lot 8 premises for $447.50 per month, Robert C. Rogers d/b/a The Hobby Hut leased 1786 square feet at a rental of $528.00 per month, and Jasmin, Inc., a corporation owned by Mohammed Jasmin and Henry Tauzin which did business under the trade name of Mo's Buster Brown Shoes, leased 3001 square feet for a monthly rental of $762.00. Each of these leases was for five years with an option to renew for an additional five years.
Apparently at the end of 1974 or the beginning of 1975, a dispute commenced between Claitor and Juban over the use of the driveway on the eastern edge of Parcel 3 and the use of the Parcel 3 parking lot by tenants and customers from Lot 8. Juban, through his attorney, offered to allow use of the driveway and parking lot to Claitor, his tenants, and their customers, for $250.00 per month. Claitor made a counteroffer for *1307 the use of and access to Parcel 3 by paying a pro rata share of the maintenance costs of the premises. Apparently, negotiations broke down, and in 1975 Juban Properties, Inc., as owner of Parcel 3, filed a suit for declaratory judgment against Claitor,[3] as owner of Lot 8, seeking to establish its right to construct a fence along the property line separating Parcel 3 and Lot 8. Claitor defended this suit on the grounds that rights of use and access were created by the Reciprocal Agreement and by verbal agreements between he and Juban. Claitor did not advise his tenants of the dispute with Juban over the access to or use of Parcel 3, nor did he advise them of the pending litigation for authority to construct the fence at this time.
In 1976 Claitor filed suit against Juban, individually, alleging that Juban Properties, Inc. was seeking court authority to erect the fence in question in violation of the Reciprocal Agreement between Claitor, Juban and Kroger and in violation of verbal agreements between Juban and Claitor. Claitor sought damages in the form of attorney fees for defending the declaratory judgment suit and for injuries to his business interests in the form of loss of profits and rents.
On May 9, 1977, and effective January 1, 1977, Henry Tauzin, individually, bought the business known as Mo's Buster Brown Shoes from Jasmin, Inc. and Jasmin, Inc. assigned the lease of the premises to him with the written consent of Claitor. Effective February 1, 1977, Robert C. Rogers subleased the premises occupied by The Hobby Hut to Anthony Bordelon d/b/a Bordelon Sewing Center with the verbal consent of Claitor. Claitor did not advise either Tauzin or Bordelon of the dispute over the use of Parcel 3 or the pending suit for declaratory judgment at this time.
On March 3, 1977, the declaratory judgment suit went to trial and resulted in a decision in favor of Claitor and denying the right of Juban Properties, Inc. to construct the fence. Juban Properties, Inc. appealed to this court and on December 28, 1977, we reversed the trial court and rendered judgment in favor of Juban Properties, Inc. authorizing the construction of the fence. Juban Properties, Inc. v. Claitor, 354 So.2d 672 (La.App. 1st Cir. 1977). We ruled that the terms of the written Reciprocal Agreement were not applicable to Lot 8 and by implication ruled that there was no binding verbal agreement between Claitor and Juban. Claitor sought supervisory writs from the Louisiana Supreme Court which were denied on March 27, 1978. Juban Properties, Ltd. v. Claitor, 356 So.2d 440 (La.1978).
On June 9, 1978, Juban Properties, Inc. erected a chain link fence between Parcel 3 and Lot 8. This construction prompted immediate complaints from the tenants on Lot 8. Several days later, Claitor Realty and Mr. and Mrs. Claitor, individually, filed suit against Juban, Juban Properties, Inc. and the lessee of Parcel 3 seeking a judgment recognizing their right to use of and access to Parcel 3 and seeking an injunction to require removal of the fence. The lessee filed an exception of no cause of action which was sustained. Juban and Juban Properties, Inc. filed motions for summary judgment which were granted by the trial court on the grounds that the fence was constructed pursuant to a final judgment and did not create a cause of action in favor of the plaintiffs. This court affirmed in an unpublished opinion which adopted the trial court's reasoning. On September 28, 1979, the Louisiana Supreme Court granted the writs sought by the plaintiffs. R. G. Claitor's Realty v. Juban, 375 So.2d 947 (La. 1979). On January 28, 1980, the Louisiana Supreme Court affirmed the rulings of the trial court and this court. R. G. Claitor's Realty v. Juban, 391 So.2d 394 (La.1980). A rehearing was granted and the original decree was reinstated on October 20, 1980, on the grounds that the suit was properly the subject of a plea of res judicata.
*1308 Because of the presence of the chain link fence between Lot 8 and Parcel 3, Tauzin and Tri-J stopped paying their monthly rent in June of 1978, and Bordelon stopped paying his rent in July of 1978. On December 4, 1978, Claitor and Claitor Realty served notices of eviction on the tenants of Lot 8 who were not paying their rent. This suit was filed on December 6, 1978, and the rents which were due under the leases were deposited into the registry of the court by court order. Bordelon left the leased premises in March of 1979, four months prior to the end of the primary term of the lease. Tri-J left the leased premises on or about February 19, 1979, five and one-half months prior to the end of the primary term of the lease. Tauzin did not leave the leased premises and was still there at the time of the trial.
In 1979 while the suit by the Claitor group against the Juban group to remove the fence was pending in the Louisiana Supreme Court, an amended petition was filed in the 1976 suit by Claitor against Juban, individually, adding R. G. Claitor Realty as a party plaintiff and Juban Properties, Inc. as a party defendant. This amended petition further alleged a reciprocal oral agreement between the parties for the use of Parcel 3 and Lot 8 by their owners, occupants and customers; that Claitor developed Lot 8 in reliance upon this oral agreement; and that the erection of the fence was a breach of this oral agreement by Juban and Juban Properties, Inc. This amended petition sought damages for negligence, intentional wrongdoing and in contract. At the same time in the instant case, Claitor and Claitor Realty filed a third party demand against Juban and Juban Properties, Inc. for indemnification for any amounts for which they may be cast in favor of the tenants alleging essentially the same thing that was alleged in the amended petition in the 1976 Claitor-Juban suit. Juban and Juban Properties, Inc. filed motions for summary judgment in the 1976 Claitor-Juban suit and to the third party demand by Claitor and Claitor Realty against them in the instant suit. These summary judgments were granted in the trial court on the ground that the issues contained therein were res judicata. These judgments were affirmed by this court on the date of this decision under separate docket numbers.

II. BREACH OF CONTRACT AND DUTY IN TORT
Contracts legally entered into have the effect of laws on those who have formed them. La.C.C. art. 1901. Tauzin, Bordelon and Tri-J have identical lease agreements with Claitor and Claitor Realty. The pertinent portions of these leases are as follows:
"1. PREMISES. Lessor leases to Lessee and Lessee leases from Lessor those certain premises consisting of a storeroom measuring approximately 1504 square feet center line to center line being constructed at 3751 Perkins Road according to Claitor's East floor plan dated 5/22/74 attached herewith and made a part of this lease.
* * * * * *
"17. COMMON FACILITIES. Landlord agrees there shall be joint use of sidewalks, driveways and parking area for automotive and pedestrian traffic to and from entire premises. Tenant agrees that it and its employees will not use the first row of parking adjoining buildings on entire premises, which are reserved for joint use of customers only. Tenant and employees will park only in lot behind (north of) Animal Health Clinic.
* * * * * *
"27. COMMON AREA MAINTENANCE. On January 1st of each year, Tenant shall pay Landlord an annual parking lot maintenance fee for preceding year of $150.00 total (part years to be on pro rata basis).
* * * * * *
"THIS LEASE embodies the entire contract of the parties hereto and shall not be altered, changed or modified in any respect, except by an instrument of equal dignity...."
*1309 The tenants contend "that Claitor chose to allow the tenants to suffer irreversible damage rather than reveal to the tenants that he had earlier misrepresented his ownership of the property." The thing actually leased to each tenant is a specified amount of space in the building constructed by Claitor on Lot 8. Attached to each lease is the building floor plan. However, the lease agreements also provide for the joint use of the common sidewalk, driveway and parking areas on the "entire premises" and the tenants pay an annual parking lot maintenance fee of $150.00. There are no attachments to the leases showing the location or extent of the sidewalks, driveway and parking areas available to the tenants on the "entire premises". The courts are bound to give legal effect to all contracts according to the true intent of the parties. The intent is to be determined by the words of the contract when these are clear, explicit and lead to no absurd consequences. La. C.C. art. 1945. Where the contract is clear and unambiguous, it cannot be varied, explained or contradicted by parole evidence. The meaning and intent of the parties to the contract in such cases must be sought within the four corners of the instrument. La.C.C. art. 2276; White v. Rimmer & Garrett, Inc., 340 So.2d 283 (La.1976); Breaux v. May, 392 So.2d 1089 (La.App. 3rd Cir. 1980); Mathieu v. Nettles, 383 So.2d 1337 (La.App. 3rd Cir. 1980). However, when there is uncertainty or ambiguity as to the provisions of a contract or the intent of the parties, parole evidence is admissible to clarify the ambiguity and to show the true intent. Dixie Campers, Inc. v. Vesely Company, 398 So.2d 1087 (La.1981). Heritage Square Investments v. Trouard, 406 So.2d 309 (La.App. 3rd Cir. 1981). The trial judge correctly determined that the leases were ambiguous concerning exactly what were the "entire premises" and what sidewalks, driveways and parking areas were subject to joint use and he properly allowed parole evidence on these issues. See Bond v. Green, 401 So.2d 639 (La.App. 3rd Cir. 1981).
James G. Harris, III, one of the owners of Tri-J, testified that Claitor did not tell him that he or his customers could park on Parcel 3, that he did not know Parcel 3 belonged to Juban Properties, Inc., that Claitor told him that he and his employees were to park behind the Animal Health Clinic in accordance with the lease provision, that he assumed that he and his customers had parking rights on Parcel 3, and that Claitor did not tell him that he couldn't park on Parcel 3. Anthony Bordelon testified that Claitor made no representations to him concerning parking one way or the other on Parcel 3. Henry Tauzin testified that Claitor never told him anything about where to park or about parking on Parcel 3. Claitor testified that the intent of paragraph 17 was to permit joint use of the sidewalks, driveways and parking areas located on Lot 8 "and that I had permission from Mr. Juban for them to use the rest of it." The evidence further shows that the tenants and customers of Lot 8 used the parking area on Parcel 3 from August 1, 1974 until Juban Properties, Inc. constructed the fence on June 9, 1978.
Because the jury rendered a general verdict and was not required to utilize a special verdict form, all factual disputes in this case are presumed to have been resolved by it in favor of the plaintiffs. Steele v. St. Paul Fire & Marine Insurance Company, 371 So.2d 843 (La.App. 3rd Cir. 1979); Brown v. Hartford Insurance Company, 370 So.2d 179 (La.App. 3rd Cir. 1979); Bolden v. New Orleans Public Service, Inc., 349 So.2d 377 (La.App. 4th Cir. 1977). Under either factual version set forth above, there is no evidence that Claitor made improper misrepresentations to the tenants concerning his ownership of Parcel 3. The three tenants testified that no misrepresentations concerning parking on Parcel 3 were made to them. James G. Harris, III specifically testified that he assumed that parking rights on Parcel 3 were granted by the lease. Under Claitor's version, the tenants had permission from Mr. Juban to use Parcel 3. There is no evidence in the record to show that the tenants made inquiries concerning the ownership of Parcel 3. There is no evidence that any of the tenants checked the public records of East Baton Rouge *1310 Parish to determine the limits of Lot 8 or Parcel 3. There is no evidence of record to show that Claitor at anytime showed any maps to the tenants indicating the location of the boundary between Parcel 3 and Lot 8. If the jury in this case determined that Claitor made improper misrepresentations concerning the ownership and/or right to use of and access to Parcel 3, such conclusion was clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
The tenants assert that Claitor had a duty to advise them of the dispute with Juban and Juban Properties, Inc. over the access to and use of the driveway and parking facilities on Parcel 3. A review of the lease agreements indicates that nowhere contained therein is there an obligation by the lessors to consult with the tenants concerning constructions on adjoining properties. Each lease agreement specifically provides that it is the entire contract between the parties and cannot be modified except by an instrument of equal dignity. No such instrument has been produced. Even if there were such an obligation, the breach of such would cause no damage to the tenants under the facts of this case. Juban Properties, Inc. lawfully constructed the fence. Juban Properties, Inc. v. Claitor, supra. Claitor and Claitor Realty had no enforceable right to use the driveway and parking facilities of Parcel 3. R. G. Claitor's Realty v. Juban, supra. Even if the tenants would have joined in the litigation, the result would have been the same. Even if it is assumed that Juban granted gratuitous permission to use Parcel 3, his revocation of that permission does not create a cause of action in favor of the tenants unless that permission was part of the lease agreement. Lemoine v. Devillier, 189 So.2d 694 (La.App. 3rd Cir. 1966).
The tenants maintain that Claitor owed them a "duty to protect the plaintiffs from the erection of the fence...." A review of the lease agreements reveals that there is no provision contained therein which requires the lessors to judicially contest constructions on property adjoining Lot 8 which would be harmful to the tenants' use of their leased premises. In any event, Claitor vigorously litigated and opposed the right of Juban and Juban Properties, Inc. to erect the fence. In the original case by Juban Enterprises, Inc. for the declaratory judgment for authority to construct the fence, Claitor was successful in the trial court but lost on appeal in this court. Claitor filed suit individually against Juban to enforce purported written and verbal agreements which he claimed authorized access to and use of the Parcel 3 premises. Claitor has pushed that claim to a conclusion in this court. Claitor and Claitor Realty filed a suit to enjoin the construction of the fence and obtain its removal and litigated that suit to the Louisiana Supreme Court. Under these circumstances, Claitor and Claitor Realty certainly used the court system extensively in attempting to protect their interests and those of their tenants. If the jury concluded otherwise, it was clearly wrong.
The tenants assert that "the utter lack of available parking" is a hidden vice or defect under La.C.C. art. 2695[4] entitling them to damages. The thrust of the tenants' complaint is that they have been denied free access to and use of Parcel 3 by the construction of the fence. We do not agree that the fence lawfully constructed on adjoining property is a vice or defect in the thing leased by Claitor and Claitor Realty to the tenants. Paragraph 17 of the leases does not require any specific amount, type or location of parking facilities. The leases do not require the lessors to secure off-premises parking rights for the tenants.
There is evidence of record to indicate that customers still park on Parcel 3 and walk around the fence to come to stores on Lot 8. In addition, parking is provided on Lot 8. The record reflects that there are ten paved parallel parking spaces in front of the leased premises, thirteen between the *1311 leased premises and the Animal Health Clinic, and an additional thirteen on the paved portion of the parking lot located behind the Animal Health Clinic. The evidence shows that pursuant to the zoning regulations of the City-Parish of East Baton Rouge that one parking space is required for every two hundred feet of floor area of a building. The building in which the leased premises are located contains 10,133 square feet, and thus 51 parking places are required for that building.[5] The site development plan submitted by Claitor to the Department of Public Works for the City-Parish of East Baton Rouge shows 55 proposed parking spaces to accommodate the construction of the building in which the tenants are located. Apparently, thirty-six of the parking spaces are paved and the remaining parking spaces are unpaved. Article 2695 is not applicable to these facts and circumstances.
It is our opinion that this case is controlled by the provisions of La.C.C. art. 2699 which provides as follows:
"If, without any fault of the lessor, the thing cease to be fit for the purpose for which it was leased, or if the use be much impeded, as if a neighbor, by raising his walls shall intercept the light of a house leased, the lessee may, according to circumstances, obtain the annulment of the lease, but has no claim for indemnity."
There is ample evidence of record to show that the use of Lot 8 as a shopping center is much impeded by the restriction of access to and from Parcel 3 caused by the construction of the fence. We find the raising of a fence to obstruct access and limit the use of Lot 8 to be analogous to the raising of a wall by an adjoining landowner to intercept the light on a leased house. No act[6] of Claitor or Claitor Realty contributed to the erection of the fence and, in fact, they vigorously opposed its construction.
The tenants are not entitled to damages but are entitled to obtain the annulment of their leases. That is apparently what the trial court allowed Tri-J and Bordelon to do because he only cast them for rents up to the time that they left the leased premises, even though that occurred several months prior to the end of the primary terms of the leases. Claitor and Claitor Realty did not contest that ruling in this appeal. Tauzin has elected to remain on the leased premises and did not raise the issue of annulment on appeal.

III. CONCLUSION
For the foregoing reasons, it is our opinion that the judgment of the jury against Claitor and Claitor Realty for damages in tort and contract is clearly wrong and is reversed. Judgment is rendered herein in favor of Claitor and Claitor Realty and against Tauzin, Bordelon and Tri-J dismissing their petitions with prejudice. Tauzin, Bordelon and Tri-J are cast for all costs of this appeal and the costs in the trial court are to be divided equally between the parties plaintiff (one-half) and the parties defendant (one-half).
REVERSED AND RENDERED.
NOTES
[1] Tauzin, Bordelon and Tri-J did not appeal the judgments against them and they are final. The unpaid rents have been deposited into the registry of the court. The parties stipulated in the trial court that the judgments against Tauzin, Bordelon and Tri-J shall not become executory until such time as the judgments against Claitor and Claitor Realty become final.
[2] At some time after this contract was executed, Juban transferred Parcel 3 to Juban Properties, Inc.
[3] Prior to the trial in the suit for declaratory judgment, Claitor conveyed various interests in Lot 8 to the trustee of four trusts he created in favor of his children and to R. G. Claitor Realty Company, a family partnership composed of Claitor, his wife and the trusts.
[4] "Art. 2695. The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was made, and even if they have arisen since, provided they do not arise from the fault of the lessee; and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same."
[5] There is no evidence in the record to show how many parking spaces are required for the Animal Health Clinic.
[6] The reporter's comment under Article 2699 indicates that there was an error in the English translation of the French text and the word "fault" in the opening clause should be "act".